UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                                   :

BENNIE McCALL, JR.,                :

                    :

          Plaintiff,        :

                    :         05 Civ. 2042 (GEL)

     -v.-                :

                    :      **OPINION AND ORDER**

MICHAEL J. ASTRUE,        :
Commissioner of Social Security  :

                    :

          Defendant.     :

                    :
-------------------------------------------------------------x

James S. Trainor, Jr., Amit H. Thakore, White &
Case LLP, New York, New York, for plaintiff.

Leslie A. Ramirez-Fisher, Assistant United States
Attorney, and Barbara L. Spivak (of Counsel),
New York, New York, for defendant.

GERARD E. LYNCH, District Judge:

      Plaintiff Bennie McCall brings this action pursuant to 42 U.S.C. § 405(g), seeking review

of a final decision of the Commissioner of Social Security ("the Commissioner"). Unlike most

such appeals, there is no dispute in this case that plaintiff is in fact disabled, and has been at least

since the time he filed an application for supplemental security income benefits in 1986. The

Commissioner, however, has determined that plaintiff is not eligible for disability insurance

benefits because he did not engage in sufficient covered employment prior to becoming disabled

to meet the disability insured status requirements set forth in Title II of the Social Security Act.

Pursuant to Federal Rule of Civil Procedure 12(c), both parties now move for judgment on the

pleadings. For the following reasons, plaintiff's motion will be granted, and the Commissioner's

motion will be denied.

**BACKGROUND**

I.      **The Social Security Program**

The United States Government provides benefits to disabled persons through two distinct

programs administered by the Social Security Administration ("SSA").  The Social Security

Disability Insurance Program ("SSD"),[1] established by Title II of the Social Security Act, 49 Stat.

622, as amended, 42 U.S.C. § 401 et seq., provides for the payment of disability benefits only to

those who have previously contributed to the program and who suffer from a mental or physical

disability.  See Bowen v. City of New York, 476 U.S. 467, 470 (1986); State of N.Y. v. Sullivan,

906 F.2d 910, 913 (2d Cir. 1990).  By contrast, the Supplemental Security Income Program

("SSI"), established by Title XVI of the Social Security Act, 86 Stat. 1465, as amended, 42

U.S.C. § 1381 et seq., provides for the payment of disability benefits based solely on an

individual's indigent status and is therefore a need-based program available to claimants

independent of their prior social security contributions.  See Bowen, 476 U.S. at 470; Sullivan,

906 F.2d at 913.  When applying for benefits, a claimant may file concurrently under Title II and

Title XVI.  While "Title II payments are considered income and can reduce, if not completely

eliminate, Title XVI awards[,] Title XVI [awards] . . . do not affect Title II eligibility."  Pappas v.

Bowen, 863 F.2d 227, 228 (2d Cir. 1988).

Pursuant to statutorily conferred authority, the Secretary of Health and Human Services

("Secretary") has promulgated a complex regulatory scheme governing eligibility for SSD and

SSI awards.  See Bowen, 476 U.S. at 470.  The governing statutes for both programs require a

claimant to show that he is legally disabled, and define disability as the "[inability] to engage in

---

[1] This opinion also refers to SSD benefits as disability insurance benefits.

any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); see also id. § 1382c(3)(A).  A claimant who establishes that he is disabled and that he meets the requirements for indigency set forth in § 1382 and related provisions will be eligible for Title XVI SSI benefits. See 42 U.S.C. § 1381a.

Establishing eligibility for Title II benefits, however, is more difficult.  Not only must a Title II claimant establish that he is disabled, but he must also establish that he is insured for disability benefits and that he became disabled prior to the expiration of his disability insured status.  See id. §§ 423(a)(1)(A), 423(a)(1)(D), 423(c); see also Arnone v. Bowen, 882 F.2d 34, 37 (2d Cir. 1989); Serrano v. Astrue, No. 05 Civ. 1356, 2008 WL 2622927, at *4 (E.D.N.Y. July 1, 2008).  Generally, a claimant is disability insured when he has accrued 20 quarters[2] of coverage during the 40-quarter (10-year) period preceding his onset date of disability.[3]  See 20 C.F.R. § 404.130; see also Butts v. Sec'y of Health and Human Servs., 706 F.2d 107, 107 (2d Cir. 1983). A quarter of coverage is the basic unit of social security coverage used to determine a worker's insured status.  See 20 C.F.R. § 404.140(a).  Such quarters are credited based on an employee's earnings from covered- or self-employment.  See 20 C.F.R. § 404.140.  According to the Act and its implementing regulations, such earnings are called wages.  The SSA, which is required to maintain earnings records for all individuals, consults its records to determine the amount of

---

[2] The term "quarter" refers to the period of three calendar months ending March 31, June 30, September 30, or December 31.  See 42 U.S.C. § 413(a)(1).

[3] The 20/40 requirement applies to those who allege disability onset after the age of thirty-one, have not had a previous disability prior to the age of thirty-one, and are not statutorily blind.  See 20 C.F.R. § 404.130.

wages a claimant has been paid.  <u>See</u> 42 U.S.C. §§ 405(c)(2)(A), (c)(3); 20 C.F.R. §§ 404.803(a), 404.1001(a)(1).  Because the amount of wages required to credit a claimant with a quarter of coverage varies according to the year in which the wages were paid, <u>see</u>, <u>e.g.</u>, <u>Crichlow v. Shalala</u>, No. 92 Civ. 7602, 1994 WL 132155, at *4 (S.D.N.Y. Apr. 12, 1994), the SSA calculates a claimant's quarters of coverage by referencing the yearly wage requirement and the amount of wages its own records show a claimant has been paid.  Because the beginning and end of the relevant 40-quarter period depend on the onset date of disability, and because a claimant can have disability insured status for one 10-year period but lack it for another, the date a claimant first became disabled is often critically important.

As a general rule, state agencies acting under the authority and supervision of the Secretary make the initial determination of a claimant's compliance with the above requirements. <u>See</u> <u>Bowen v. Yuckert</u>, 482 U.S. 137, 142 (1987).  In New York, this function is performed by the Office of Disability Determinations ("ODD") of the New York State Department of Social Services.  <u>See</u> <u>Sullivan</u>, 906 F.2d at 913.  Where the ODD denies a claimant's application for benefits, the claimant may seek federal administrative review by the SSA.  <u>See</u> <u>id</u>.  This review proceeds in three stages.  <u>See</u> <u>Bowen</u>, 482 U.S. at 142.  "First, the determination is reconsidered *de novo* by the state agency.  Second, the claimant is entitled to a hearing before an administrative law judge (ALJ) within the Bureau of Hearings and Appeals of the Social Security Administration.  Third, the claimant may seek review by the Appeals Council." <u>Id</u>. (citations omitted).  Once a claimant has exhausted these administrative remedies, he may seek judicial review in federal district court.  <u>See</u> 42 U.S.C. § 405(g).

4

## II.     McCall's Employment and Earnings History

Plaintiff Bennie McCall was born on June 21, 1941.  (R. 38.)  He has a high school

education and a 25-year history of semi-skilled employment that includes work as a maintenance

man, groundskeeper, and corrections officer.  (R. 59, 447.)  From December 1, 1980, until his

termination on August 8, 1986, McCall worked as a manual laborer, maintenance man, and truck

driver for the Department of Parks and Recreation of the City of New York ("DP&R").  (R. 149,

446.)  DP&R pay stubs and McCall's W-2s indicate that Federal Insurance Contributions Act

("FICA") taxes[4] were withheld from his pay in 1980 and 1981.  (R. 51, 124, 146.)  However, no

such taxes were withheld from 1982 to 1986.  (R. 43-44, 50, 52, 109, 170.)  This lack of

withholding was the result of a change in McCall's employment status while working at the

DP&R.  When McCall joined the DP&R in 1980, he was a CETA employee[5] and social security

taxes were automatically withheld from his wages, but on September 30, 1981, he became a

provisional parks services worker, for whom social security deductions were mandatory only if he

elected to join the New York City Retirement System.  (R. 43, 53.)  Because McCall did not join

the retirement system, social security taxes were not deducted from his wages from 1982 to 1986.

(R. 43.)  FICA taxes were deducted, however, from short-term disability payments that he

received from his union when he was unable to work in September and October 1983.  (R. 477-

80, 557-60.)

_____

[4] FICA taxes are popularly known as social security taxes because they are levied on income from covered wages or self-employment earnings and are used to fund social security benefits.

[5] "CETA" refers to the Comprehensive Employment and Training Act of 1973, Pub. L. 93-203, which provided federal funding for certain public service jobs.

In administering payroll, DP&R paid employees bi-weekly on Fridays, but routinely made paychecks available on the Thursday afternoon immediately preceding payday.  (R. 125-26, 186-87, 447-48, 460-61, 482-83.)  Where the Thursday immediately preceding payday fell on a city holiday, paychecks were instead made available on the Wednesday preceding payday.  (R. 448, 482-83.)  Given that McCall would have been paid for his work during the last two weeks of December 1980 on Friday, January 2, 1981, his paycheck ordinarily would have been made available on Thursday, January 1, 1981.  However, because this date fell on New Year's Day, McCall's paycheck was made available on Wednesday, December 31, 1980.  (R. 483.)

A Detailed Earnings Record produced by the SSA shows that McCall earned four quarters of coverage per year from 1976 through 1979; one quarter of coverage in 1980; four quarters of coverage in 1981; and no quarters of coverage from 1982 through 1986.[6]  (R. 47, 106, 167.)  To qualify for SSD benefits, McCall must have accrued 20 quarters of coverage during the 10 years preceding his onset date of disability.

## III.    McCall's Medical History

McCall's medical problems began as early as 1974, when he suffered a mental breakdown and seizure.  (R. 446.)  In 1975, he was diagnosed with hypertension and bursitis.  (R. 446.)  A few years later, in 1978, he was evaluated by Dimitrios Fournarakis, M.D., at Montefiore Hospital Medical Center in the Bronx, New York, for a sleep disorder.  (R. 446, 452-54.)  According to an April 1, 1978, letter from Dr. Fournarakis, McCall was then being treated

---

[6] An SSA Detailed Earnings Query Response indicates that the City of New York reported only non-covered earnings on McCall's record for calendar years 1982-1986.  (R. 402-03.)

for narcolepsy.[7]  (R. 452.)  Subsequent letters, from June and September 1978, indicate that his

evaluation could be completed only after further visits.[8]  (R. 453-54.)  In February 1983, McCall

fell into a diabetic coma and was hospitalized for nearly two weeks.  (R. 73, 446.)  Following

this episode, his health deteriorated further, and he suffered from sleep deprivation, severe neck-

and headaches, diabetes, and hypertension.  (R. 447.)  According to McCall, all of these ailments

interfered with the performance of his work duties.  (Id.)  However, the neck- and headaches,

which he affirms he experienced regularly for at least six months prior to his termination from

DP&R, were particularly debilitating, often requiring him to stop mid-route while driving DP&R

trucks.  (Id.)  McCall also suffered from obesity, bipolar disorder, personality disorder, and

affective disorder, although these conditions were not diagnosed until after his termination from

DP&R.  (Id.)

        In or about August 1986, McCall petitioned the New York State Department of Labor

("NYDOL") for state benefits.[9]  (R. 456.)  This application was denied on August 9, 1986.  (Id.)

However, on October 14, 1986, a state Administrative Law Judge ("ALJ") overruled this initial

determination and found that McCall had lost his job due to disabling medical conditions,

concluding that although McCall "was terminated because of excessive lateness and absences,"

---

[7] Dr. Fournarakis found that McCall had suffered from this disorder since October 1974.

[8] Although the letter dated September 6, 1978, indicates that McCall would have to return to the Sleep-Wake Disorders Center on September 26, 1978, to complete his evaluation (Tr. 454), the record contains no documentation from any subsequent visit addressing the outcome of this evaluation.

[9] McCall characterizes these benefits as disability benefits (P. Mem. 20), but it is unclear whether this characterization is accurate, as the heading of the notice of decision granting his application reads "Unemployment Insurance Administrative Law Judge Section."  (R. 456.)  The distinction is largely immaterial, however, because the decision was rendered by a state governmental agency and relates to McCall's medical history and ability to work.

his "last absence [on July 28, 1986] . . . , and his prior latenesses and absences, were caused by his medical problems."[10]  (Id.)  The ALJ's finding of disability was further supported by a doctor's report deeming McCall unable to work.[11]  (R. 457.)

Two years later, in December 1988, McCall was evaluated by Dr. Ellen Weinberg, a psychiatrist, who opined that although he "was suffering from confusion . . . and from an overly-vague thought process (or means of expression)[,] . . . [h]e d[id] not have an acute psychotic nor affective disorder."  (R. 465-66.)  Dr. Weinberg also noted that "cognitive testing shows normal concentration short term recall, although [McCall] is overly concrete with difficulty abstracting ideas.  These features can contribute to his difficulty obtaining and functioning in employment." (R. 465-66.)

## IV.    Procedural History

McCall, a 67 year-old man in poor health, has been seeking to resolve his claim for social security benefits on and off for some 22 years.  About thirteen years after his initial petition for disability insurance benefits, McCall renewed his efforts and – reinvigorated by the assistance he has received from pro bono counsel since at least 2002 – has contested the denial of benefits ever since.  McCall's counsel, who has proven to be an extremely effective and able advocate, has made a heroic effort, investing substantial amounts of time and energy to develop old facts and recover what little of McCall's original file remained.  At present, no one disputes that McCall is

---

[10] In reaching this conclusion, the ALJ found that "[c]laimant suffered from a serious physical disorder, for some period of time, which was known to the employer."  (R. 456.)

[11] The form on which the doctor's opinion appears is undated, but identifies September 12, 1986, as the date the doctor last examined McCall.  (R. 457.)  It also states that McCall was under the doctor's care from August 1986 until the time of the assessment.  (Id.)

disabled, or that he has a 25-year work history during which he dutifully paid social security taxes on some $160,000 of wages.  (R. 71, 167.)  His 22-year battle has proven unfruitful solely because of the SSA's calculation of his quarters of coverage.  Ironically, while the SSA contends that McCall is two quarters short of disability insured status, it reaches that conclusion in part by rejecting quarters during which social security taxes were actually withheld from McCall's pay, based on technicalities concerning the propriety and timing of those withholdings, neither of which was within McCall's control.

On September 29, 1986, McCall applied for both Title XVI SSI and Title II SSD benefits.  (R. 42, 45, 192, 217-18, 535.)  Because the SSA subsequently lost his file and only partially reconstructed it (R. 191), the SSA cannot determine what became of the Title II portion of McCall's application.  The Title XVI application was initially denied, but the Appeals Council concluded in an April 19, 1989, decision that McCall was disabled as of September 29, 1986, the date of his application, and he then began to receive SSI benefits.[12]  (R. 42, 57-68, 172-83, 192, 194.)  In support of its determination, the Appeals Council noted:

> The record, including additional evidence which was submitted in
> connection with the request for review, contains statements from
> the claimant's treating physicians, to the effect that he is unable to
> work, can do less than a full range of sedentary work because of
> his severe hypertension, diabetes, and obesity, and is unable to

---

[12] The Appeals Council decision does not purport to identify the precise date on which McCall became disabled.  Rather, the significance of the September 29, 1986, date is that McCall first applied for SSI benefits on that date, and SSI benefits cannot be paid retrospectively for periods before an application was made.  See 20 C.F.R. § 416.335.  The Appeals Council ruling thus establishes that McCall was disabled *at least* as of September 29, 1986.  The decision says nothing about whether he was disabled before that date.  It is a reasonable inference, however, given that McCall's disability resulted not from a sudden accident but from long-standing ailments, that he did not suddenly become disabled on the date of his application, but that he had become disabled at some point before September 1986.

> maintain adequate social functioning on account of his mental
> impairment, as described on the form appended to this decision
> (Exhibits 29, AC-3 and AC-4).[13]  These opinions are not
> contradicted by substantial evidence, and are essentially
> corroborated by findings made at consultative evaluations
> performed in December 1986, July 1987, and August 1987
> (Exhibits 15, 17, 21 and 22).  In accordance with the
> Commissioner's ruling in the Schisler class action, they are
> binding.[14]

(R. 58, 173.)

In 1999, McCall filed a second application for Title II disability insurance benefits.  (R.

16.)  This application was never processed, and he filed a third application on August 18, 2000,

which was awarded a protective filing date of July 19, 2000.  (R. 16, 38-40, 192, 372.)  McCall

initially alleged a disability onset date of July 1, 1986.  (R. 38.)  However, he later amended this

date to August 8, 1986, the date on which his employment ended.  (R. 38, 149, 530.)

In connection with his application for disability benefits, McCall stated that his

conditions first bothered him on April 8, 1975, but that he did not become unable to work until

August 8, 1986.  (R. 70.)  When asked to describe the nature and effect of his ailments, he

asserted that his ability to work was limited by "[e]nlarged prostate, diabetic coma, high blood

---

[13] This documentation demonstrates that McCall suffered from affective and personality disorders; that he had a "history of a possible manic episode in the past, now in remission, with constricted affect, mild agitation, and circumstantial, tangential thinking"; and that he exhibited "[i]nflexible and maladaptive personality traits which cause either significant impairment in social or occupational functioning or subjective distress, as evidenced by": oddities of thought, perception, speech and behavior; persistent disturbances of affect (mildly constricted); passivity and aggressivity; and obsessive features.  (R. 60-65.)

[14] Although the Appeals Council decision appears in the record, the record does not contain the statements from McCall's treating physicians or the 1986-1987 consultative findings on which the Appeals Council based its disability finding.  It is reasonable to infer that these documents were among those lost with McCall's original file (R. 191), and that they were omitted from the reconstructed file because they could not be reproduced.

pressure, weight, gallbladder removed[,] taking an array of medications and mental illness," which "usually [left him] mentally and physically drained." (R. 70.) McCall stated: "Due to my illnesses, injuries and conditions, I was forced to work less and take time off from my job." (R. 70.) In addition to providing information about his ailments, he listed the names and contact information of his treating physicians, and identified Ms. Imogene Robinson, a social worker, as someone other than a doctor whom the SSA could contact for further information about his health. (R. 69, 72-73.)

The SSA denied McCall's application initially and on reconsideration,[15] concluding that as of August 8, 1986, he had only eighteen of the twenty quarters of coverage required to prove disability insured status under Title II of the Act. (R. 24-25, 46-47, 192.) Following denial of his application, McCall requested a hearing before an ALJ. (R. 26.) On July 18, 2002, he appeared with his attorney before ALJ Hazel C. Strauss, who heard testimony and argument. (R. 16-17, 189-228.) After *de novo* review of McCall's case, the ALJ issued a decision on January 27, 2003, concluding that McCall was not entitled to disability benefits because as of August 8, 1986, he had not satisfied the disability insured status requirements of Title II. (R. 16-23.) While she specifically acknowledged that McCall had been adjudged disabled as of September 29, 1986, on account of hypertension, diabetes mellitus, obesity, and an inability to maintain "adequate social functioning because of mental impairments" (R. 19), she found that he was not disabled prior to his date last insured of March 31, 1986.[16] (R. 19, 22.) On December 9, 2004,

---

[15] The notices of these denials do not appear in the record, presumably because they, too, were lost and unable to be reproduced. (R. 191; Comm'r Mem. 2 n.5.)

[16] Despite the finding that McCall was not disabled prior to his date last insured, the January 27, 2003, decision provides absolutely no substantive discussion of his medical history

the Appeals Council denied McCall's request for review of this decision, making it the final decision of the Commissioner.  (R. 3.)

Plaintiff commenced the present action on February 14, 2005.  On May 22, 2006, he moved for judgment on the pleadings, arguing that he was entitled to additional quarters of coverage for calendar years 1976, 1980, and 1983.  (R. 303-12, 315.)  By Order dated October 13, 2006, this Court remanded the case to the Commissioner pursuant to the sixth sentence of 42 U.S.C. § 405(g) for consideration of new evidence, and identified the relevant question as "[w]hether new evidence shows that claimant should be credited with the two additional quarters of coverage to qualify him for disability insurance benefits."  (R. 565-67.)  In particular, the Court noted that McCall had introduced evidence apparently showing FICA deductions from short-term disability payments he received in 1983.[17]  (R. 566.)

In light of this Court's Order, the Appeals Council remanded the case to an ALJ on October 26, 2006, and instructed the ALJ to take any action needed to resolve the discrepancy between pay stubs suggesting that McCall's short-term disability earnings were covered earnings within the meaning of the Act and the SSA's detailed earnings records indicating that no such earnings had been reported.  (R. 561-64.)  The Appeals Council also instructed the ALJ to consider whether sick payments made within six months of the termination of employment are "wages" pursuant to 20 C.F.R. § 404.1051 and give rise to additional quarters of coverage when

_____

or the medical evidence of record and the relationship between this information and the onset date found by the ALJ.   The ALJ instead seems to have simply accepted August 8, 1986, as the date of onset because that was McCall's last day of employment.

[17] This evidence consisted of photocopies of four pay stubs from the District Council 37 ("District 37 ") Health and Security Plan from September and October 1983.  (R. 477-80, 563.) District 37 is the union to which McCall belonged at the time.

the payments are made by a union, but – pursuant to 20 C.F.R. § 404.1020 – the underlying

employment is non-covered employment.  (R. 564.)

On January 22, 2007, McCall appeared with his attorney before ALJ Newton Greenberg.

(R. 528-38.)  The ALJ heard argument on the issues, and limited testimony was taken.[18]  (Id.)

Having reviewed McCall's case *de novo*, the ALJ issued a decision on March 23, 2007,

concluding that McCall still had not met the disability insured status requirements of Title II.  (R.

373, 379-80.)  In particular, he found that McCall was not disabled prior to August 8, 1986,

because McCall engaged in substantial gainful activity up until that date,[19] and, relying on the

rationale adopted by ALJ Strauss and the Appeals Council, that McCall could not be credited

with an additional quarter of coverage for 1980.  (R. 376, 380.)

After reviewing the March 2007 decision, the Appeals Council again remanded the case

to ALJ Greenberg, finding that he had failed to address whether McCall's employment by a

"non-covered" employer would preclude the SSA from treating sick pay made by a covered

union as earnings under 20 C.F.R. § 404.1051, and that he neither verified the contents of the

four newly introduced pay stubs nor addressed the apparent discrepancy in the evidence that they

created.  (R. 332-35.)

──────────────

[18] The argument taken pertained only to the crediting of quarters of coverage for calendar year 1983.  When McCall's counsel attempted to discuss the crediting of quarters of coverage for calendar years 1976 and 1980, the ALJ instructed him to put his arguments in writing and stated that "whatever you submit, I'll consider it before I make my decision."  (R. 537.)

[19] The ALJ did not make a finding that August 8, 1986, was the proper onset date of disability.  Instead, noting that the Appeals Council had identified that date as September 29, 1986, during McCall's SSI proceedings, he simply concluded that moving the onset date back to August 8 would not change the number of quarters of coverage McCall had earned, and rejected any onset date *earlier* than August 8.  (R. 376.)

In response to this remand, on September 25, 2007, the ALJ submitted a questionnaire regarding the four pay stubs to James B. Barhold, Manager of the Disability Unit at District 37. (R. 552-56.)  The questionnaire requested verification of the short-term disability payments awarded to McCall and information as to whether the FICA taxes withheld from those payments were actually paid to the Internal Revenue Service or, if not, whether District 37 had any knowledge regarding the payment of any such taxes by McCall's employer.  (R. 554-56.) District 37 did not respond.  (R. 325.)

On October 3, 2007, McCall again appeared with his attorney before ALJ Greenberg. While the ALJ heard argument, no testimony was taken.[20]  (R. 539-50.)  In a November 30, 2007, decision reviewing McCall's case *de novo*, ALJ Greenberg again concluded that McCall was not entitled to benefits because he had not met the applicable disability insured status requirements.  (R. 316-27.)  In support of this conclusion, the ALJ reasoned that McCall was engaged in "non-covered" employment from September 30, 1981, through August 8, 1986, and that McCall's "receipt of 'covered' wages during the period [in] which he was engaged in 'non-covered' employment [did] not [prove] that the SSA's records [were] incorrect."  (R. 327.) Consequently, pay stubs showing deduction of FICA taxes from McCall's short-term disability payments provided no basis for crediting him with the additional quarters of coverage needed to demonstrate an entitlement to benefits.[21]  (Id.)  On January 30, 2008, the Appeals Council denied

---

[20] At this hearing, McCall's counsel specifically noted that McCall, who had "from day one . . . argued for the crediting of an additional quarter of coverage, not just in 1983, but also in 1976 and 1980," was not waiving any arguments for additional coverage in years other than 1983.  (R. 542.)

[21] The November 30, 2007, decision did not address McCall's claims that he was entitled to additional quarters of coverage for calendar years 1976 and 1980.  (R. 323-27.)

McCall's request for review of the November 2007 decision, making it the final decision of the Commissioner.  (R. 231-32.)

On May 30, 2008, the Commissioner moved for judgment on the pleadings, and plaintiff, in turn, renewed his May 22, 2006, motion for judgment on the pleadings.

## V.      The Parties' Contentions

McCall argues that he has demonstrated entitlement to at least four additional quarters of coverage – two for calendar year 1983, one for 1980, and at least one for 1976.  (P. Mem. 1.)  In support of his claim for two additional quarters of coverage for 1983, he cites disability payments received from his union, from which FICA taxes were withheld.  (Id. 2.)  McCall further argues that he was constructively paid in 1980 (although this pay was not actually received until 1981), giving him an additional quarter of coverage in 1980, and that his onset date of disability was on or before June 30, 1986, which would entitle him to an additional quarter of coverage in 1976, since a disability onset date in the second quarter of 1986 would move the 40-quarter eligibility period back to include the third quarter of 1976, when McCall received covered wages.  (Id. 16-24.)

The Commissioner, in response, argues that because McCall's employment was non-covered at the time of his union disability payments, those payments were not covered earnings and cannot be relied upon as the basis for accrual of additional quarters of coverage.  (Comm'r Mem. 15.)  The Commissioner also denies that McCall was constructively paid in 1980, and contends that the medical evidence of record, which is sparse, does not support McCall's claim of an onset date of disability of June 30, 1986.  (Id. 17-24.)

15

**DISCUSSION**

**I.     Standard and Scope of Review**

Pursuant to 42 U.S.C. § 405(g), this Court has "power to enter, upon the pleadings and

transcript of the record, a judgment affirming, modifying, or reversing the decision of the

Commissioner of Social Security, with or without remanding the cause for a rehearing."  In

reviewing such decisions, the Court "review[s] the administrative record *de novo* to determine

whether there is substantial evidence supporting the Commissioner's decision and whether the

Commissioner applied the correct legal standard."[22]  Byam v. Barnhart, 336 F.3d 172, 179 (2d

Cir. 2003); see also Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999) ("First, the Court reviews

the Commissioner's decision to determine whether the Commissioner applied the correct legal

standard.  Next, the Court examines the record to determine if the Commissioner's conclusions

are supported by substantial evidence.") (citations omitted).  For purposes of this inquiry,

substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402

U.S. 389, 401 (1971), quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938); see

also Bush v. Shalala, 94 F.3d 40, 45 (2d Cir. 1996).

---

[22] Unlike the Commissioner's factual determinations, his conclusions of law are not
subject to the substantial evidence test.  See Byam, 336 F.3d at 179.  As noted by the Second
Circuit, "[w]here an error of law has been made that might have affected the disposition of the
case, this court cannot fulfill its statutory and constitutional duty to review the decision of the
administrative agency by simply deferring to the factual findings of the ALJ.  Failure to apply
the correct legal standards is [therefore] grounds for reversal."  Townley v. Heckler, 748 F.2d
109, 112 (2d Cir.1984) (quotation omitted); see also Turriciano v. Barnhart, No. 03 Civ. 3751,
2004 WL 2326385, at *4 (E.D.N.Y. Aug. 17, 2004) (noting that the substantial evidence test "is
irrelevant to the Commissioner's legal conclusions, or to his or her compliance with applicable
procedures mandated by statute or regulation, which are reviewed *de novo*").

Applying these standards, a court "may set aside a decision of the Commissioner if it is based on legal error or if it is not supported by substantial evidence." Bonet v. Astrue, No. 05 Civ. 2970, 2008 WL 4058705, at *2 (S.D.N.Y. Aug. 22, 2008), citing Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998). In making such determinations, courts should be mindful that "[t]he Social Security Act is a remedial statute which must be 'liberally applied'; its intent is inclusion rather than exclusion." Rivera v. Schweiker, 717 F.2d 719, 723 (2d Cir.1983), quoting Marcus v. Califano, 615 F.2d 23, 29 (2d Cir.1979) (internal quotation marks omitted); see also Vargas v. Sullivan, 898 F.2d 293, 296 (2d Cir.1990).

## II.   McCall's Disability Insured Status

Title II of the Act makes federal disability insurance benefits available to those who are "disabled" within the meaning of its terms.[23] See 42 U.S.C. § 423(a), (d). However, an individual seeking such benefits must first establish that he has attained disability insured status, and that he became disabled prior to the expiration of that status. See id. §§ 423(a)(1)(A), 423(a)(1)(D), 423(c); see also Arnone v. Bowen, 882 F.2d 34, 37 (2d Cir. 1989); Serrano v. Astrue, No. 05 Civ. 1356, 2008 WL 2622927, at *4 (E.D.N.Y. July 1, 2008). Where a worker alleges disability onset after the age of thirty-one, has not had a previous period of disability prior to the age of thirty-one, and is not statutorily blind, he will be accorded disability insured status only upon a showing that he has accrued at least 20 calendar quarters of coverage during the 40-quarter (10-year) period immediately preceding the quarter in which the onset of

---

[23] The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

disability occurred.  See 20 C.F.R. § 404.130; see also Butts, 706 F.2d at 107.  Quarters of

coverage accrue when an employee meets a specified level of covered income, which level has

varied from year to year.[24]

      In ascertaining whether an individual possesses the requisite quarters of coverage, the

Commissioner looks to the SSA's earnings record[25] for evidence of the wages paid to that

individual in a given year.  See 42 U.S.C. § 405(c)(3); 20 C.F.R. §§ 404.803(a), 404.1001(a)(1).

For this purpose, only earnings from covered employment constitute "wages," and generally,

unless covered by an agreement under Section 218 of the Act, state employees, or employees of

political subdivisions of a state, are not engaged in covered employment.[26]  See 20 C.F.R. §

404.1020(a)(1).  Where a Section 218 agreement does extend coverage to state employees, such

employees have the same rights with respect to benefits as all other covered employees.  See 20

---

[24] For all years prior to 1978, an individual accrued one quarter of coverage for every
quarter in which he received $50.00 or more in wages or $100.00 or more in self-employment
income.  See 42 U.S.C. § 413(a)(2); 20 C.F.R. §§ 404.141, 404.142.  For calendar year 1978, an
individual accrued one quarter of coverage for every quarter in which he received $250.00 or
more in wages or self-employment income.  See 42 U.S.C. § 413(d)(1); 20 C.F.R. §
404.143(a)(1).  For all years after 1978, an individual's accrued quarters of coverage are
calculated based on the earnings requirements published in the Federal Register on or before
November 1 of the preceding year.  See 42 U.S.C. § 413(d)(2); 20 C.F.R. § 404.143(a)(2).
According to these published requirements, in calendar years 1980 and 1983, an individual
accrued one quarter of coverage for every quarter in which he received $290.00 and $370.00,
respectively, in wages or self-employment income.  See 20 C.F.R. Part 404, Part B, Appendix 1
(listing requirements for calendar years 1979-1992).

[25] Pursuant to 42 U.S.C. § 405(c)(2)(A), "the Commissioner of Social Security shall
establish and maintain records of the amounts of wages paid to, and the amounts of self-
employment income derived by, each individual and of the periods in which such wages were
paid and such income was derived."

[26] Section 218 of the Act permits a state to request that the Commissioner extend social
security coverage to specific groups of employees of that state or political subdivisions thereof.
See C.F.R. § 404.1200(a).

18

C.F.R. § 404.1200(a).

By regulation, an SSA earnings record showing an absence of covered wages is evidence that no such wages were paid.  See 20 C.F.R. § 803(a).  An individual has three years, three months, and fifteen days after the close of a taxable year to correct any errors or deficiencies in his earnings records.  See 42 U.S.C. §§ 405(c)(1)(B), 405(c)(4).  Once that time has elapsed, however, the records become conclusive evidence that no wages were paid during that period, unless one of the exceptions for correcting earnings records applies and there is sufficient evidence to demonstrate the records' inaccuracy.  See 42 U.S.C. §§ 405(c)(1)(B), 405(c)(4), 405(c)(5); 20 C.F.R. §§ 404.803(c)(2), 404.822.  The exceptions are broad enough to permit a worker to offer evidence that covered wages were in fact received but not recorded.[27]

Because the Commissioner does not dispute that McCall is disabled or that he has accumulated eighteen of the twenty quarters of coverage required to prove disability insured status, the only issue to be resolved is whether McCall is entitled to at least two additional quarters of coverage and has therefore been improperly denied disability insurance benefits.

A.    McCall's Short-Term Disability Payments

Under 20 C.F.R. § 404.1051, certain disability payments made by an employer or third party to a claimant can be counted as wages for the first six months that they are received.  See § 404.1051(a)-(b).  McCall argues that because FICA taxes were deducted from the disability pay he received from his union, the ALJ erred as a matter of law in concluding that § 404.1051 did

---

[27] The exceptions include, but are not limited to, an error apparent on the face of the record; fraud; improper attribution of earnings to the wrong person or period; or reporting lower wages than were actually earned.  See 42 U.S.C. § 405(c)(5); 20 C.F.R. §§ 404.803(c)(2), 404.822.

not entitle him to two additional quarters of coverage for calendar year 1983. (P. Mem. 6-15.)
The Commissioner, however, contends that such disability payments are wages only where the
claimant's underlying employment is covered. (Comm'r Mem. 13-17.) Because McCall was not
engaged in covered employment when he received the union disability payments, the
Commissioner argues that any FICA taxes withheld from McCall's disability pay were withheld
in error and create no entitlement to benefits. (Id.)

Section 404.1051 states in relevant part:

> (a) We do not include as wages any payment that an employer
> makes to you, or on your behalf, on account of your sickness or
> accident disability, or related medical or hospitalization expenses,
> if the payment is made more than 6 consecutive calendar months
> following the last calendar month in which you worked for that
> employer. Payments made during the 6 consecutive months are
> included as wages.
>
> (b) The exclusion in paragraph (a) of this section also applies to
> any such payment made by a third party (such as an insurance
> company).

20 C.F.R. § 404.1051(a)-(b). McCall relies on the last sentence of § 404.1051(a), which states
that disability payments made by an employer or third party during the first six months of a
period of disability "are included as wages," to argue that under the regulation, *any* disability
payment from an employer or third party categorically constitutes "wages" for the first six
months.

This interpretation is flawed. A reading of the entire section demonstrates that the
regulation's principal purpose is not to define payments that *do* constitute wages, but rather to
identify an *exclusion*, that is, to describe categories of payments that will *not* be deemed wages
for purposes of determining a claimant's insured status. Thus, the regulation begins by

20

describing the sorts of payments that are "*not* include[d] as wages." § 404.1051(a) (emphasis added). Subsection (b), in extending the rule to disability payments made by a third party, explicitly refers to the rule as an "exclusion." § 404.1051(b).

The purpose of § 404.1051, then, is not to expand the definition of "wages" beyond its ordinary meaning of earnings from covered employment, but is to *exclude* from that definition pay from the employer (or a third party) that is in the nature of *long-term* disability benefits. The last sentence of subsection (a) serves simply to delineate the bounds of this exclusion by noting that *short-term* sick pay – payment for periods of inability to work extending up to six months – is not within the scope of the exclusion.

Given the regulation's primary purpose of excluding certain types of payments from being considered wages, it is necessary to resort to other regulations to establish the circumstances under which a worker's income constitutes wages in the first instance.[28] 20 C.F.R. § 404.1001, the introduction to the subpart containing § 404.1051, makes clear that claimants "receive credit only for earnings that are covered for social security purposes" and that "earnings are covered only if [a claimant's] work is covered." § 404.1001(a)(1). It also defines wages as covered earnings from covered work. § 404.1001(a)(2)-(3). Thus, Section 404.1051's use of the word "wages" plainly suggests that its terms apply only to those claimants engaged in

---

[28] A proper understanding of the limited purpose of § 404.1051 undermines McCall's argument that the Commissioner's reading of § 404.1001(a)(1) renders § 404.1051 superfluous and inoperative. (P. Reply Mem. 3-5.) Although § 404.1051 indicates that some disability payments may be treated as wages, it does not address the type of employment an individual must have prior to receiving those disability payments for such payments to be considered wages. This information is supplied by § 404.1001(a)(1).

covered work.[29]

To the extent that there is any ambiguity in the regulation, deference is owed to the Commissioner's interpretation. An agency's interpretation of a regulation that it has promulgated is entitled to deference unless the interpretation is "plainly erroneous or inconsistent with the regulation [itself]." Auer v. Robbins, 519 U.S. 452, 461 (1997), quoting Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 359 (1989); see also Fowlkes v. Adamec, 432 F.3d 90, 97 (2d Cir. 2005). In United States v. Larionoff, 431 U.S. 864 (1977), the Supreme Court noted that the government's reading of a regulation should be accepted where it "is not plainly inconsistent with the wording of the regulation[]." Id. at 872-73. Not only does the text of § 404.1051 support the Commissioner's interpretation, but his interpretation also accords with the overall purpose and structure of the social security statutory scheme. See Larionoff, 431 U.S. at 873 (noting that an administrative regulation is valid only if consistent with its governing statute). Consistent with the requirement that those seeking Title II SSD benefits must first have engaged in a certain amount of covered employment, and thus paid into the system from which they desire to benefit, § 404.1051 requires that a claimant be engaged in covered employment when he becomes disabled and begins to draw disability payments in order

---

[29] McCall argues that the Commissioner's interpretation is inconsistent with the text of § 404.1051, contending that unless § 404.1051 is read independently of other regulatory provisions within the same subpart, the definition of wages set forth in § 404.1041 – remuneration for service – will necessarily be at odds with the concept of disability pay, as receipt of such pay is not contingent on an employee performing some sort of service. (P. Mem. 7-9.) This argument is incorrect. Sick pay is a benefit that, like other pay, is provided to employees in exchange for their services. An employee does not have to work on every day for which he is paid for that pay to be considered remuneration for services. There is no inconsistency in treating sick pay, any more than paid holidays or vacation time, as covered "wages" because they are a part of the package of remuneration provided to employees for the services provided on the days they do in fact work.

for the first six months of those payments to be treated as wages entitling him to additional quarters of coverage.

McCall's interpretation, however, would lead to anomalous results. Reading § 404.1051 as McCall advocates would mean that workers in non-covered employment would accrue quarters of coverage only when they have the misfortune of becoming disabled and receiving disability payments, while their counterparts working in precisely the same uncovered positions without becoming incapacitated would be denied any such accrual. This could not have been the agency's intent.

Since the Commissioner's interpretation of § 404.1051 is neither inconsistent with the regulation itself, nor plainly erroneous, that interpretation must be accorded substantial deference. Under that interpretation, McCall is entitled to additional quarters of coverage for disability payments received in 1983 only if his underlying employment was covered. According to SSA earnings records, McCall had no covered earnings in 1983. These records comport with the testimony of Thomas Giannattasio, a DP&R personnel supervisor, who asserted that McCall's position with the DP&R was covered during 1981, but non-covered for the years 1982 through 1986.[30]  (R. 43-44.)

The record evidence indicates that FICA taxes were in fact withheld from McCall's 1983 union disability payments.[31]  There is thus considerable equitable appeal to McCall's argument that those payments should be held to entitle him to quarters of coverage. The political appeal of

---

[30] This testimony is consistent with § 404.1020, pursuant to which state employment generally is not covered.

[31] It is unclear whether these withholdings were ever remitted to the IRS. The ALJ requested this information from District 37 (R. 552-56) but received no response. (R. 325.)

the American social security system is largely attributable to the perception that those who

contribute taxes to the system will be able to reap what they understand to be the benefits

secured by their contributions should the need arise.  Unfortunately, however, "ascertaining

whether an individual is 'insured' within the meaning of the Social Security Act is a

determination not characterized by case-specific exceptions reflecting individualized equities,"

but by uniform principles applied in a mechanical way.  Acierno v. Barnhart, 475 F.3d 77, 82 (2d

Cir. 2007) (quotation omitted); see also Thibodeau v. Barnhart, No. 06 Civ. 1344, 2007 WL

895687, at *4 (S.D.N.Y. Mar. 23, 2007).[32]  Coverage is achieved by receiving covered "wages"

from covered employment or self-employment, not from having FICA taxes erroneously

withheld from payments that are not in fact covered and not subject to the tax – particularly

when, so far as the record shows, the withheld sums were not actually paid to the government.[33]

While the Act and its implementing regulations permit McCall to correct an earnings

record that reports fewer wages than were actually earned, see 42 U.S.C. § 405(c)(5)(H); 20

C.F.R. §§ 404.822(a), 404.822(e)(5), for the reasons stated above he has been unable to make the

---

[32] As the Second Circuit elaborated in Acierno, "the administrative law judge's role . . . involve[s] primarily the counting of quarters of coverage, which are determined by reference to how much an individual earned over a three-month period."  475 F.3d at 82.

[33] It is a further irony that the union to which McCall belonged, and which is supposed to protect his interests, may have erroneously withheld FICA taxes from his disability payments, thus depriving him of funds that he ought to have received and leading him to believe that he was acquiring social security coverage.  The union then apparently failed to remit the taxes to the IRS.  Had District 37 actually remitted to the government the sums it withheld from McCall's pay, McCall might well have been credited (even if incorrectly) with coverage, since his earnings record would presumably have shown covered earnings in 1983, and there is no reason to believe the SSA would have looked beyond the earnings record in determining his eligibility. Compounding this apparent dereliction, District 37 failed even to respond to the ALJ's request for information regarding the withholding and remittal of taxes from McCall's short-term disability payments, not even to state that it no longer had the relevant information.

requisite showing, and the SSA's records are therefore conclusive.  See 20 C.F.R. § 404.803.

The ALJ was entitled to conclude that McCall was not engaged in covered work in 1983 and

therefore could not benefit from the terms of § 404.1051.  Accordingly, the ALJ's denial of

McCall's claim to two additional quarters of coverage for his receipt of disability payments in

1983 is supported by substantial evidence and will not be disturbed.

      B.    <u>Actual and Constructive Payment</u>

      McCall next argues that, contrary to the ALJ's decision, he is entitled to an additional

quarter of coverage for 1980 because he was either actually paid or constructively paid wages in

the fourth quarter of that year.  (P. Mem. 16-19.)  In response, the Commissioner argues that

because McCall "has presented no evidence showing that the money, not merely the paycheck,

was made available to him on December 31, 1980, and that those funds could be drawn upon on

December 31, 1980," there is no basis for concluding that he was actually paid in 1980.

(Comm'r Mem. 21.)  The Commissioner also contends that McCall's constructive payment claim

is foreclosed by the SSA's interpretation of the regulation governing such payments.  (Id. 22-23.)

While the ALJ's factual findings are supported by substantial evidence, the ALJ failed to apply

the proper legal standard in determining whether McCall was paid within the meaning of 20

C.F.R. § 404.1042(a), and his decision must therefore be set aside.

      For purposes of assessing a claimant's disability insured status, a claimant accrues

quarters of coverage based on the date on which he receives the wages giving rise to such

coverage.  According to 20 C.F.R. § 404.1042(a), "[w]ages are received by an employee at the

time they are paid," and they are, in turn, paid at the time that they are "actually or constructively

paid."  While § 404.1042 does not define the phrase "actually paid," it defines constructive

25

payment in the following manner:

> Wages are constructively paid when they are credited to the
> account of, or set aside for, an employee so that they may be drawn
> upon by the employee at any time although not then actually
> received.  To be a payment– (1) The wages must be credited to or
> set aside for the employee and must be made available without
> restriction so that they may be drawn upon at any time; or (2) The
> employer must intend to pay or to set aside or credit, and have the
> ability to pay wages when due to the employee, and failure of the
> employer to credit or set aside the wages is due to clerical error or
> mistake in the mechanics of payment, and because of the clerical
> error or mistake the wages are not actually available at that time.

20 C.F.R. § 404.1042(b).

McCall relies on Hennessey v. Federal Security Administrator, 88 F. Supp. 664 (D.

Conn. 1949), to argue that his paycheck dated January 2, 1981, was constructively paid on

December 31, 1980, when it would have been made available for pick-up.  (P. Mem. 18-19.)  In

Hennessey, plaintiff challenged the SSA's determination that she was not entitled to a quarter of

coverage for the third quarter of the year because the wages that she earned during the last full

week in September were not paid to her until the regular payday on the first Friday in October.

See 88 F. Supp. at 665-66.  Construing an earlier version of 20 C.F.R. § 404.1042(b), the court

commented that because plaintiff was working as an at-will employee, her "contract for hire . . .

resemble[d] a severable and divisible contract, running from day to day," and her daily

performance thus "gave rise to a legally enforceable right to compensation for services

performed that day."  Id. at 667.  Because "[t]here was neither an express understanding between

the plaintiff and her employer as to the making of payments at any time other than the regular

'deferred' pay-day, nor a scintilla of evidence of any consideration for an enforceable obligation

to forego the payment of [her] wages at any particular time[, she] merely acquiesced in a custom

which was for the administrative convenience of the employer." Id.  Absent any indication that

the employer lacked the funds with which to pay plaintiff, or "that the plaintiff could not have

drawn upon her wages at any time had she chosen really to go after them," the court concluded

that plaintiff had been constructively paid during the third quarter of the relevant calendar year.

See id. at 666-68.[34]

Whether or not Hennessey was correct at the time it was decided, subsequent action by

the SSA – particularly Social Security Ruling ("SSR") 73-20, which is binding on the

Commissioner,[35] and POMS RS 01401.040[36] – suggests that the broad reasoning embraced by

that decision and its progeny no longer accords with the SSA's interpretation of § 404.1042(b).

---

[34] Other courts have likewise recognized the rule that "[t]here can be no 'substantial limitation or restriction' within the meaning of the [regulation governing constructive pay] in the absence of evidence that the plaintiff could not have drawn upon her wages at any time had [she] chosen really to go after them." Morris v. Celebrezze, 238 F. Supp. 717, 720 (E.D.N.Y. 1965), quoting Hennessey, 88 F. Supp. at 668; see also LaBonne v. Heckler, 580 F. Supp. 558, 560-61 (D. Minn. 1984) (rejecting the Secretary's argument that plaintiff received his paycheck one day too late to demonstrate disability insured status on the grounds that plaintiff was constructively paid during the quarter in which he earned the wages at issue because he could have been paid prior to his employer's regular payday, and because his employer had the financial wherewithal to supply those wages). Cf. Levine v. Ribicoff, 201 F. Supp. 692, 694 (S.D.N.Y. 1962) (recognizing the rule of constructive payment, but holding that no constructive payment exists where wages are credited to an employee's account but the employer does "not have or maintain the funds to make the payment"); Morgan v. Social Security Bd., 45 F. Supp. 349, 351-52 (M.D. Pa. 1942) (recognizing the rule of constructive payment, but holding that an employer's lack of cash with which to pay plaintiff's wages constitutes a substantial limitation or restriction barring a finding that any such payment has been received).

[35] See 20 C.F.R. § 402.35(b)(1) (noting that social security rulings published in the Federal Register under the authority of the Commissioner "are binding on all components of the Social Security Administration"); Heckler v. Edwards, 465 U.S. 870, 873 n.3 (1984).

[36] POMS, the SSA's Program Operations Manual System, "represents the internal policy of the SSA with respect to interpreting regulations and laws." Ellis v. Chater, No. 94 Civ. 6754, 1997 WL 177893, at *2 n.2 (S.D.N.Y. Apr. 11, 1997). As expressed by the SSA itself, "POMS is a primary source of information used by Social Security employees to process claims for Social Security benefits." See https://secure.ssa.gov/apps10/poms.nsf/aboutpoms.

According to SSR 73-20, in determining the number of quarters of coverage a claimant has accrued, the doctrine of constructive payment does not apply where a claimant is employed at a specified daily rate but – except in emergency situations and, even then, only upon the employer's approval – receives payment of wages on a regular pay schedule pursuant to which he or she is paid in one quarter for work performed during the previous quarter.  Relying on this ruling, POMS RS 01401.040 provides that where an "employer has a regular payday, there is an implied limitation on making payment before that day.  To overcome this limitation, there must be evidence that shows the employer customarily paid all employees, or all those of a certain class, including the employee, upon request."

In short, subsequent SSA interpretations cast doubt on the holding of Hennessey that an at-will employee is "constructively" paid on the day she earns her pay, even if the actual payment of the sums earned is deferred to a regular payday.  While RS 01401.040 does not have the force of law, it constitutes an agency interpretation and is entitled to deference unless plainly erroneous or otherwise at odds with the governing statute or regulation.  See Washington State Dep't of Social & Health Servs. v. Guardianship Estate of Keffeler, 537 U.S. 371, 385 (2003) (noting that although the administrative interpretations set forth in POMS "are not products of formal rulemaking, they nevertheless warrant respect"); Binder & Binder PC v. Barnhart, 481 F.3d 141, 151 (2d Cir. 2007) ("A POMS entry might arguably be evidence of the SSA's public construction of its authorizing statute or the Commissioner's own regulations, a construction that, if consistent with that statute, would be entitled to some level of deference."); Thibodeau, 2007 WL 895687, at *3 ("While not binding authority, the POMS 'deserve substantial deference, and will not be disturbed as long as they are reasonable and consistent with the statute.'"),

28

quoting <u>Bubnis v. Apfel</u>, 150 F.3d 177, 181 (2d Cir. 1998); <u>Ellis</u>, 1997 WL 177893, at *2 n.2

(noting that as an agency interpretation, a POMS provision "must be given controlling weight

unless it is plainly erroneous or inconsistent with the regulation").  McCall does not argue that

the interpretation embodied in RS 01401.040 is plainly erroneous or otherwise inconsistent with

§ 404.1042(b), nor could he.  RS 01401.040 does nothing more than elaborate the meaning to be

accorded "substantial limitation" and the manner in which that meaning should be applied.  It is

therefore entitled to deference.

McCall, however, need not rely on the broad reasoning of <u>Hennessey</u> to prevail.  He does

not argue, like the plaintiff in that case, that he was constructively paid because he *worked* in

1980 and earned in that year pay that he did not receive until his regular payday in 1981.  Rather,

he argues that he was actually or constructively paid in 1980 because he received the relevant

paycheck in that year.

The unrebutted record evidence establishes that it was the DP&R's custom to make

paychecks available to employees on the Thursday immediately preceding a Friday payday, or –

where such a Thursday fell on a holiday – on the Wednesday immediately preceding the Friday

payday.  (R. 125-26, 186-87, 447-48, 460-61, 482-83.)  Given the timing of the New Year's

holiday in 1981, McCall has established that his paycheck dated January 2, 1981, was actually

made available to him on December 31, 1980.  McCall need not demonstrate that he himself

actually picked up his check that week on that date.  According to POMS RS 01401.030, "wages

are paid when actually or constructively received or when an economic benefit is derived."  The

provision in turn defines "constructive receipt" as an employee's ability to receive payment

earlier than the time of actual receipt.  Illustrating proper application of this definition, RS

29

01401.030 offers the following example:

> Salary checks mailed on the last day of a pay period are
> constructively received on that day if employees are permitted to
> pick up their checks personally.  If employees may only receive
> the salary checks by mail, there is no actual or constructive receipt
> until the pay period in which the checks are received.

POMS RS 01401.030.  Thus, if employees are *permitted* to pick up their checks on Wednesday,

all employees constructively receive their checks on that date, even if some of them in fact do

not pick up their checks until some later date.

While SSR 73-20 and RS 01401.040 cast doubt on <u>Hennessey</u> by insisting that the

employer's regular payday controls the timing of the receipt of wages for coverage purposes,

those interpretations do not speak to a situation in which the employer's "official" regular

payday is subverted by a practice of making paychecks available before that date.  Neither SSR

73-20 nor <u>Hennessey</u> and its progeny involves any allegation that a claimant's paycheck was

made physically available to him or her during the quarter for which he or she sought credit.

And RS 01401.030 clearly indicates that an employee constructively receives his wages when he

is "permitted to pick up" his check.

The Commissioner argues that pay cannot be deemed received if the check may be

picked up on one day, but is postdated to a future date.  (Comm'r Mem. 21-22.)  This position

has considerable logical force.  An employee is not "paid" by being permitted to hold a

worthless piece of paper, but by receiving an economic benefit.  If the check is not payable until

January 2, the fact that the employee is permitted to possess it arguably does not constitute

payment.

Nevertheless, the Commissioner's argument is flawed.  Whatever the abstract logic of the position, it finds no textual support in the regulations or in the POMS manual.  To the contrary, the relevant guidance points the other way.  First, 20 C.F.R. § 404.1042(b) speaks of wages as constructively paid "when they are credited to the account of, or set aside for, an employee so that they may be drawn upon by the employee at any time."  When a paycheck is cut and made available to the employee, the employee's earnings are no longer simply an inchoate obligation owed to the employee based on hours worked, but they have been "set aside for" the employee.

Second, RS 01401.030 consistently speaks to the receipt of salary checks, not to the date when they can be presented for payment to the employer's bank.  The provision states that "wages are paid when . . . constructively received."  It then goes on to specify that "[s]alary checks . . . are constructively received on [the] day [that] employees are permitted to pick up their checks personally."  No reference is made to the date on the check, or the date when it will be honored by the employer's bank.  McCall's case is virtually indistinguishable from the example provided in RS 01401.030.

Third, RS 01401.030 alternatively provides that wages are paid "when an economic benefit is derived."  Receipt of a City paycheck on the eve of a holiday clearly confers an economic benefit on the employee.  The New York Banking Law expressly permits licensed check-cashers, which are in general prohibited from "cash[ing] or advanc[ing] any moneys on a post-dated check or draft," to cash a check "payable on the first banking business day following the date of cashing" where "(a) [the] check is drawn by . . . the state of New York, or any political subdivision of the state of New York, or by any department, bureau, agency, authority, instrumentality or officer, acting in his official capacity, of the . . . state of New York or of any

31

political subdivision of the state of New York, or (b) [the] check is a payroll check drawn by an employer to the order of its employee in payment for services performed by such employee." N.Y. Banking Law § 373.1 (McKinney 2008).   The check in question was *both* a payroll check *and* drawn on the City of New York, and thus could legally be cashed by McCall on the day it was received.  Presumably, indeed, the very purpose of making the checks available on the eve of their official date is to confer such economic benefits on the employee.

 In light of the requirement that the Act be construed to include, rather than exclude, see Vargas, 898 F.2d at 296, the failure on the part of the agency to consider these regulations, which clearly point in favor of McCall's position, constitutes legal error.  See Hilton v. Apfel, No. 97 Civ. 1613, 1998 WL 241616, at *7-8 (S.D.N.Y. May 13, 1998); see also Shontos v. Barnhart, 328 F.3d 418, 424-25 (8th Cir. 2003); Avery v. Astrue, No. 06 Civ. 30143, 2007 WL 2028881, at *5-8 (D. Mass. July 10, 2007); Locke v. Massanari, 285 F. Supp. 2d 784, 798-99 (S.D. Tex. 2001).  McCall must be held to have received his pay for the last pay period of 1980 during that year, not on the official payday in January 1981.  Accordingly, the Commissioner's decision is reversed in this respect, and McCall is entitled to an additional quarter of coverage for calendar year 1980.

    C.    <u>McCall's Onset Date of Disability</u>

 Plaintiff's final argument is that by amending his alleged onset date of disability to June 30, 1986,[37] he is entitled to one additional quarter of coverage for calendar year 1976.[38]  (P.

---

    [37] McCall initially alleged an onset date of disability of July 1, 1986.  (R. 38.)  He subsequently amended his alleged onset date to August 8, 1986, the date his employment with DP&R ended.  (R. 38, 149, 530.)  McCall now seeks to amend his amended onset date to June 30, 1986.  Although there is no evidence that he has submitted any formal documentation making this amendment, his amendment is nevertheless proper.  SSR 83-20 provides that "[a

32

Mem. 20-24.)  While the Commissioner notes that the ALJ "did not specifically address [this]

. . . contention[]"[39] (Comm'r Mem. 17), he argues that the decision should be upheld because

McCall has "presented no evidence establishing that he was disabled as of June 30, 1986," and

the little medical evidence that exists does not support this amended onset date.  (Id. 19; see also

Comm'r Reply Mem. 2.)  As the ALJ's decision plainly contravenes the guidelines set forth in

SSR 83-20, it is based on legal error and must be reversed.

    The Commissioner's claim that McCall has failed to advance any evidence supporting an

onset date of disability of June 30, 1986, is unpersuasive.  Applicable case law makes clear that a

claimant's alleged onset date of disability may not be rejected solely on account of the lack of

medical evidence establishing that precise date.  See Lichter v. Bowen, 814 F.2d 430, 435 (7th

Cir. 1987); Maisch v. Heckler, 606 F. Supp. 982, 990-91 (S.D.N.Y. 1985).  Furthermore, while a

claimant bears the burden of proving any disability, see Bell v. Sec'y of Dep't of Health &

_____

claimant's] change in the alleged onset date may be provided in a Form SSA-5002 (Report of
Contact), a letter, another document, or the claimant's testimony at a hearing."  Because McCall
has argued for adoption of his amended onset date of June 30, 1986, in various memoranda
submitted to the SSA and to this Court, his amendment will be permitted.

    [38] June 30, 1986, falls in the second quarter of 1986, and the 40-quarter period preceding
that date would include the third quarter of 1976, when McCall received wages sufficient to
entitle him to such additional coverage.

    [39] Although the ALJ's November 2007 decision did not specifically mention the
possibility of awarding McCall an additional quarter of coverage for calendar year 1976, it is
inaccurate to conclude that the ALJ did not address the issue.  The ALJ's March 2007 decision
specifically concluded that McCall was not disabled prior to August 8, 1986, because he engaged
in substantial gainful activity up until that date.  (R. 376.)  This determination effectively
foreclosed McCall's argument regarding additional coverage for calendar year 1976.  The failure
of the ALJ's March 2007 decision to adequately address McCall's claims regarding calendar
year 1983 led the Appeals Council to remand the matter, and the ALJ's subsequent decision did
not address coverage for calendar year 1976.  In view of the specific nature of the Appeals
Council's remand (R. 332-35), and the ruling contained in the ALJ's March 2007 decision,
however, this Court can discern the basis on which the ALJ denied McCall's claim.

Human Servs., 732 F.2d 308, 310 (2d Cir. 1984), as well as his disability insured status, see

Butts, 706 F.2d at 108, benefits proceedings are nonadversarial and as such, an "ALJ has an

obligation to develop the record . . . , regardless of whether the claimant is represented by

counsel."[40] Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); see also Pratts v. Chater, 94 F.3d

34, 37 (2d Cir. 1996); Mann v. Chater, No. 95 Civ. 2997, 1997 WL 363592, at *4 (S.D.N.Y.

June 30, 1997) ("Under § 404.1512, the Commissioner has a regulatory duty to develop a

complete medical record before making a disability decision, and not only should objective

medical evidence be considered as 'evidence,' but also statements plaintiff or others make about

[his] impairment(s), restrictions, daily activities, efforts to work, or any other relevant statements

made in testimony in administrative proceedings can be regarded as 'evidence' when

determining a plaintiff's eligibility for disability.") (citation omitted).

 "In cases of mental impairments, this duty is especially important.  'Because mentally ill

persons may not be capable of protecting themselves from possible loss of benefits by furnishing

necessary evidence concerning onset, development should be undertaken in such cases to

---

 [40] This obligation to develop the record extends to the determination of a claimant's onset
date of disability.  While the Commissioner notes that McCall himself initially alleged an
amended onset date of August 8, 1986, "[a] claimant is not necessarily bound by the statement
made on the application form as to the onset date of [his] disability.  Although this statement is
evidence that the claimant believed that the disability began on that date, it is not conclusive.
The Secretary and the district court must determine from *all* of the evidence the date, if any,
upon which the claimant became disabled within the meaning of the law."  McGinty v. Heckler,
713 F.2d 398, (8th Cir. 1983), citing Stark v. Weinberger, 497 F.2d 1092, 1099-1100 (7th Cir.
1974).  This principle is particularly applicable in the present situation, as McCall – who has a
high school education and was unrepresented at the time he completed his application form (R.
278, 447) – could easily have confused the date he desired his benefits to commence with the
date on which he became disabled.  Moreover, the onset date of disability is the first date on
which a claimant became *legally* disabled, and to the extent that such a determination rests on a
legal conclusion, little weight can be accorded an unrepresented lay claimant's purported
"admission."

ascertain the onset date of the incapacitating impairment.'" DeLorme v. Sullivan, 924 F.2d 841, 849 (9th Cir. 1991), quoting SSR 83-20.  Thus, McCall's claim that he was disabled on or before June 30, 1986, cannot be rejected simply because he can point to no medical evidence citing that particular date.  Rather, the relevant inquiry is whether all of the available evidence supports such an onset date.

A claimant's onset date of disability is the first date on which he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  In establishing this date, the SSA must consider the claimant's allegations of onset of disability, his work history, and medical and other evidence, including the testimony of lay witnesses.  See Arroyo v. Callahan, 973 F. Supp. 397, 399 (S.D.N.Y. 1997).  A claimant's termination from employment, or an employer's request that a claimant leave his or her employment because of an inability to perform the substantial gainful activity of the job, may itself constitute evidence that the onset date of disability occurred prior to the cessation of employment.  See, e.g., Orzel v. Finch, 445 F.2d 150, 154 (7th Cir. 1971).

SSR 83-20, which is binding on the SSA, see Telfair v. Astrue, No. 04 Civ. 2122, 2007 WL 1522616, at *4 (S.D.N.Y. May 15, 2007), citing Heckler v. Edwards, 465 U.S. 870, 873 n.3 (1984), specifically addresses the onset of disabilities of nontraumatic origin:

> With slowly progressive impairments, it is sometimes impossible to obtain medical evidence establishing the precise date an impairment became disabling.  Determining the proper onset date is particularly difficult, when for example, the alleged onset and the date last worked are far in the past and adequate medical records are not available.  In such cases, it will be necessary to infer the onset date from the medical and other evidence that describe the history and symptomatology of the disease process.

35

> Particularly in the case of slowly progressive impairments, it is not necessary for an impairment to have reached listing severity (i.e., be decided on medical grounds alone) before onset can be established.  In such cases, consideration of vocational factors can contribute to the determination of when the disability began (see example under heading, "Precise Evidence Not Available -- Need for Inferences").
>
> In determining the date of onset of disability, the date alleged by the individual should be used if it is consistent with all the evidence available.  When the medical or work evidence is not consistent with the allegation, additional development may be needed to reconcile the discrepancy.  However, the established onset date must be fixed based on the facts and can never be inconsistent with the medical evidence of record.
>
> . . .
>
> The available medical evidence should be considered in view of the nature of the impairment (i.e., what medical presumptions can reasonably be made about the course of the condition).  The onset date should be set on the date when it is most reasonable to conclude from the evidence that the impairment was sufficiently severe to prevent the individual from engaging in SGA (or gainful activity) for a continuous period of at least 12 months or result in death.  Convincing rationale must be given for the date selected.

SSR 83-20.

As the ruling makes clear, the starting point in determining a claimant's onset date of disability is his alleged date of onset, and this date must be accepted if it is consistent with all available evidence.   See Willbanks v. Sec'y of Health & Human Servs., 847 F.2d 301, 304 (6th Cir. 1988) ("[SSR 83-20] demands that the claimant's claimed onset date be adopted if it is consistent with all the evidence available."); Lichter, 814 F.2d at 434-36 (vacating the ALJ's decision rejecting plaintiff's alleged onset date because that date was "not clearly inconsistent with the other available evidence").  Where the alleged onset date is not consistent with the

36

available evidence, further development of the record to reconcile the discrepancy is appropriate.
See Lichter, 814 F.2d at 435 ("If an onset date [alleged by the claimant] [i]s not consistent with
the other evidence and no alternative date [i]s clear from the evidence, SSR 83-20 . . . direct[s]
the ALJ to obtain additional medical and nonmedical evidence."). Where the medical evidence
is insufficient to establish a precise date, the date can be inferred. However, in such situations
the ALJ is "compelled . . . to employ a medical advisor to assist in determining the onset date."
Felicie v. Apfel, No. 95 Civ. 2832, 1998 WL 171460, at *4 (S.D.N.Y. Apr. 13, 1998); see also
Walton v. Halter, 243 F.3d 703, 709-10 (3d Cir. 2001) (collecting cases). Finally, where
reasonable inferences cannot be drawn from the available evidence and there is no other medical
evidence available, the ALJ should also obtain evidence from family members, friends, and
former employers.[41]

---

[41] SSR 83-20 clearly contemplates cases in which the onset date must be inferred. It
states:

> Precise Evidence Not Available – Need for Inferences
>
> In some cases, it may be possible, based on the medical evidence
> to reasonably infer that the onset of a disabling impairment(s)
> occurred some time prior to the date of the first recorded medical
> examination, e.g., the date the claimant stopped working. How
> long the disease may be determined to have existed at a disabling
> level of severity depends on an informed judgment of the facts in
> the particular case. This judgment, however, must have a
> legitimate medical basis. At the hearing, the administrative law
> judge (ALJ) should call on the services of a medical advisor when
> onset must be inferred. If there is information in the file indicating
> that additional medical evidence concerning onset is available,
> such evidence should be secured before inferences are made.
>
> If reasonable inferences about the progression of the impairment
> cannot be made on the basis of the evidence in file and additional
> relevant medical evidence is not available, it may be necessary to
> explore other sources of documentation. Information may be

Applying these principles, courts have held than an ALJ may not rely on the first date of diagnosis as the onset date simply because an earlier diagnosis date is unavailable.[42]  See Willbanks, 847 F.2d at 304; Lichter, 814 F.2d at 434-36; Swanson v. Sec'y of Health & Human Servs., 763 F.2d 1061, 1066 n.2 (9th Cir. 1985).  Similar results obtain where an ALJ adopts some other equally arbitrary onset date, such as the date on which the claimant applied for SSI benefits, received a consultative examination, or appeared before an ALJ at an administrative hearing.  See, e.g., Bell, 732 F.2d at 311; Martinez v. Barnhart, 262 F. Supp. 2d 40, 46 (W.D.N.Y. 2003); Arroyo, 973 F. Supp. at 399-400.

Here, review of the administrative record makes clear that the ALJ did not comply with the procedures and guidelines established by SSR 83-20.  Instead, without providing a convincing rationale for doing so, the ALJ appears simply to have relied on the date of McCall's SSI application.  While the Commissioner is correct that the medical evidence in the record is sparse, the available evidence – medical or otherwise – is not inconsistent with McCall's amended alleged onset date of disability.  Moreover, to the extent that additional evidence was

---

obtained from family members, friends, and former employers to ascertain why medical evidence is not available for the pertinent period and to furnish additional evidence regarding the course of the individual's condition.  However, before contacting these people the claimant's permission must be obtained.  The impact of lay evidence on the decision of onset will be limited to the degree it is not contrary to the medical evidence of record.  (In mental impairment cases, see SSR 83-15, PPS-96, Titles II and XVI, Evaluation of Chronic Mental Impairments.)

[42] The absence of medical records conclusively establishing an earlier onset date is often a function of a claimant's failure to receive treatment.  However, this Court has made clear that the mere fact that a claimant "went untreated does not mean he was not disabled."  Shaw, 221 F.3d at 133; see also Dudelson v. Barnhart, No. 03 Civ. 7734, 2006 WL 156474, at *6 (S.D.N.Y. Jan. 18, 2006).

required, the ALJ – not McCall – was required to take additional steps to procure it.

The Commissioner first argues that medical evidence pertaining to McCall's treatment for a sleep disorder in 1978 is not probative of an onset date of June 30, 1986, as it precedes that date by seven to eight years.  (Comm'r Mem. 19.)  While this evidence is not contemporaneous medical evidence corroborating McCall's precise alleged onset date, it is circumstantial evidence supporting his claim that he suffered from a number of physical and mental ailments well before June 30, 1986, and that those ailments progressed to such an extent that he could no longer engage in any substantial gainful activity by that date.

The Commissioner's claim that Dr. Weinberg's December 29, 1988, letter undermines McCall's alleged onset date (id.) fares no better.  Although Dr. Weinberg concluded that McCall did not have acute psychotic or affective disorders, she noted that he "was suffering from confusion . . . and from an overly-vague thought process (or means of expression)," and that "cognitive testing show[ed] normal concentration short term recall, although [he was] overly concrete with difficulty abstracting ideas[, which] . . . [could] contribute to his difficulty obtaining and functioning in employment."[43]  (R. 465-66.)  Standing alone, this opinion may be insufficient to establish a disability.  However, it supports the other record evidence demonstrating physical and mental ailments that preclude McCall from engaging in any substantial gainful activity, and thus corroborates his disability claim.

Even assuming that Dr. Weinberg's opinion is somehow inconsistent with McCall's disability claim, the SSA concluded – and has continued to acknowledge – that he is disabled

---

[43] As discussed above, it should be noted that the disorders addressed in Dr. Weinberg's letter are not the only grounds upon which McCall has been adjudged disabled.  (R. 58, 173.)

despite the contents of that letter.  Having done so, it cannot now argue that the letter should be deemed inconsistent with McCall's allegations regarding a particular onset date of disability.  Cf. Bell, 732 F.2d at 311 ("The ALJ, of course, was not required to credit the information contained in these letters, but it is quite apparent that he did so since he expressly relied on them in finding that Bell was disabled.  Having done so, he was not free to disregard them in determining the onset date of that same disability.").  At best, because it says nothing regarding the length of time that McCall had been suffering these mental impairments, Dr. Weinberg's letter can neither prove nor disprove McCall's alleged onset date.

Furthermore, despite the Commissioner's arguments to the contrary (Comm'r Mem. 20), the NYDOL's findings with respect to McCall's claims for state benefits constitute valid evidence that McCall was entitled to have considered.  In Cutler v. Weinberger, 516 F.2d 1282 (2d Cir. 1975), the Second Circuit concluded that "[w]hile the determination of another governmental agency that a social security disability benefits claimant is disabled is not binding on the Secretary, it is entitled to some weight and should be considered."  Id. at 1286; see also Mann, 1997 WL 363592, at *8; Fowler v. Califano, 596 F.2d 600, 603 (3d Cir. 1979); Dunbar v. Califano, 454 F. Supp. 1261, 1267 (W.D.N.Y. 1978).  This holding comports with regulations promulgated by the SSA itself.  See 20 C.F.R. § 404.1512(b)(5) ("[Evidence] includes . . . [d]ecisions by a governmental or nongovernmental agency about whether you are disabled or blind.").  Thus, although the ALJ was not required to accept the findings of the NYDOL as conclusive evidence of McCall's disability or the onset date of that disability, the findings are relevant evidence that the ALJ was obligated to consider.  See Mann, 1997 WL 363592, at *8 ("In considering whether plaintiff was disabled during the period from 1972-76, the ALJ was

40

required to consider all relevant evidence concerning plaintiff's disability, including decisions made by any governmental agency about whether she was disabled.") (citation omitted).

When accorded the weight to which it is entitled, the NYDOL's decision provides persuasive support for McCall's alleged onset date, as a state ALJ reviewing McCall's claim for state disability benefits concluded that McCall "was terminated because of excessive lateness and absences," and that his "last absence [on July 28, 1986] . . . , and his prior latenesses and absences, were caused by his medical problems." (R. 456; see also id. (noting that "[c]laimant suffered from a serious physical disorder, for some period of time, which was known to the employer").) That McCall's *last* absence was the result of his medical problems, and that, prior to his termination, his employer had a documented a history of such absences, suggests that his onset date was even earlier than July 28, 1986, thus corroborating his claims.

Although the Commissioner does not specifically address any other record evidence, McCall has asserted that he suffered from severe neck- and headaches, which began at least six months prior to his termination, as well as diabetes and severe hypertension, all of which interfered with his ability to perform his job.[44] (R. 447.)  McCall specifically affirmed that his

---

[44] Because McCall has paid social security taxes on more than $164,000 of wages over a 25-year period (R. 71, 167), his allegations are particularly worthy of weight.  As this Court has previously held, "a claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability."  Nelson v. Barnhart, No. 01 Civ. 3671, 2003 WL 1872711, at *7 (S.D.N.Y. Apr. 10, 2003) (30-year work history), quoting Rivera v. Schweiker, 717 F.2d 719, 725 (2d Cir. 1983).  "This is because a claimant with an established history of employment is unlikely to be 'feigning disability.'  As the courts in this Circuit have recognized, the failure to consider a claimant's work history in an evaluation of his or her credibility is 'contrary to the law in this circuit and the SSA's rulings.'"  Wilber v. Astrue, No. 07 Civ. 57S, 2008 WL 850327, at *3 (W.D.N.Y. Mar. 28, 2008), quoting Patterson v. Chater, 978 F. Supp. 514, 519 (S.D.N.Y. 1997) and Pena v. Barnhart, No. 01 Civ. 502, 2002 WL 31487903, at *13 (S.D.N.Y. Oct. 29 2002) (quotation omitted).

neck- and headaches often required him to stop driving his truck mid-route, and his disclosures

on his benefits application show that his conditions left him generally drained and unable to

maintain the productivity level or the attendance record characteristic of a healthy employee.

(Id.; R. 70.)  Additionally, it appears that the record once contained evidence from McCall's

treating physicians and consultative findings regarding his disability.  (R. 58, 173.)  Indeed, the

Appeals Council decision granting McCall's application for SSI benefits specifically relied upon

this evidence.  (Id.)  Through no fault of McCall's, however, this evidence has been lost and

cannot now be located or reproduced for inclusion in his reconstructed file.  (R. 191.)

In light of the foregoing, none of the record evidence can be considered inconsistent with

McCall's alleged onset date of disability.  Accordingly, absent specific evidence supporting his

decision, the ALJ was not entitled to assume that McCall suddenly became disabled on the date

he applied for SSI benefits, particularly given that McCall has been adjudged disabled at least in

part on the basis of mental impairment.[45]  See Bell, 732 F.2d at 311; Martinez, 262 F. Supp. 2d at

46; Arroyo, 973 F. Supp. at 399; Maisch, 606 F. Supp. at 991.  Cf. Moses v. Sullivan, No. 91

Civ. 6980, 1993 WL 26766, at *4 (S.D.N.Y. Jan. 19, 1993) (finding it reasonable to conclude

that where a claimant suffers from a physical disability at the time he first visits a doctor, the

disability commenced even earlier).

The record suggests that the ALJ rejected an onset date of June 30, 1986, merely because

that date predates McCall's termination from DP&R.  (R. 376, 380.)  But this argument

misconstrues applicable law.  In determining a claimant's onset date of disability, the relevant

---

[45] Consistent with a view that this Court has previously credited, "it would be 'considered impossible' [for a claimant to] suddenly develop[] a mental condition such as bipolar disorder." Dudelson v. Barnhart, No. 03 Civ. 7734, 2006 WL 156474, at *6 (S.D.N.Y. Jan. 18, 2006).

inquiry is when the claimant first became unable to engage in any substantial gainful activity, not the date on which he actually lost his job.[46]  See 42 U.S.C. § 423(d)(1)(A); SSR 83-20.  Whether the claimant was employed at the time of the alleged onset date is pertinent to this determination, but it is not conclusive.  According to 20 C.F.R. § 416.973, far from relying on the mere fact of employment as evidence of substantial gainful activity, the SSA must consider how well a claimant has performed in that employment.  "If [claimant] do[es his] work satisfactorily, this may show that [he is] working at the substantial gainful activity level.  If [he is] unable, because of [his] impairments, to do ordinary or simple tasks satisfactorily without more supervision or assistance than is usually given other people doing similar work, this may show that [he is] not working at the substantial gainful activity level."  20 C.F.R. § 416.973(b); see also Musebeck v. Heckler, 614 F. Supp. 1086, 1090 (E.D. Pa. 1985) ("It is . . . beyond doubt that how well the claimant performs [a] specific activity must . . . be considered" in determining whether the activity constitutes substantial gainful activity.).  In addition to a claimant's work performance, the following factors may also inform the determination whether he is able to engage in substantial gainful activity: "(1) a high absence rate, (2) ultimate termination due to inability to satisfactorily perform the activity without assistance, (3) special concessions made for the claimant such as fewer and easier duties, (4) production and quality of claimant's work lower than that of other employees, and (5) unusual assistance required of coworkers by claimant."

---

[46] An inability to engage in any substantial gainful activity in turn exists "only if [the claimant's] physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work."  42 U.S.C. § 423(d)(2)(A).

Musebeck, 614 F. Supp. at 1090 (citations omitted).

Consistent with these principles, several courts have recognized that "employment is not proof positive of ability to work, since disabled people, if desperate (or employed by an altruist), can often hold a job." Wilder v. Apfel, 153 F.3d 799, 801 (7th Cir. 1998); see also Gentle v. Barnhart, 430 F.3d 865, 867 (7th Cir. 2005) (noting that where a claimant has an "indulgent employer, the work may not be 'substantial gainful activity'"); Fowler, 596 F.2d at 603 ("[Claimant's] employment after [her last date of coverage] does not foreclose an award of benefits since disability 'turns on whether she was disabled within the meaning of the Act notwithstanding the fact that she actually did work.'"), quoting Stark v. Weinberger, 497 F.2d 1092, 1100 (7th Cir. 1974).  Cf. Kelley v. Callahan, 133 F.3d 583, 588 (8th Cir. 1998) (noting that once a claimant has advanced proof of disability, a "presumption that [the] claimant is not disabled merely because [he or she] had a lenient employer, a high tolerance for pain, or no other means of support would unfairly shift the burden of proof back onto the claimant at a point in the proceedings when the burden rightfully belongs on the Commissioner").

Here, the NYDOL's findings provide persuasive evidence that McCall was terminated from his position precisely because his disability precluded him from satisfactorily performing the requirements of the job, including maintaining an acceptable attendance record.  Given that DP&R documented these absences well before McCall's termination date, and that the *last* of these absences was on July 28, 1986, the available evidence supports a finding that McCall maintained employment despite the fact that he was laboring under a disability.  McCall's own assertion that as early as March 1986, he suffered from neck- and headaches that interfered with his ability to perform his job, particularly when called to drive DP&R trucks, only bolsters this

conclusion.  Thus, while McCall's employment after his alleged onset date of disability may prove that he had a somewhat tolerant employer, or that he somehow managed to do work that nevertheless aggravated his preexisting illnesses or otherwise jeopardized his health, our social security system does not require him to labor under such a burden.  See Stark, 497 F.2d at 1099 ("Under a purely literal reading of the statute, plaintiff was 'able' to do work which could only aggravate a malignant, progressive illness.  We do not believe, however, that Congress enacted a rule of law which imposes any such duty upon its intended beneficiaries.").

In sum, the ALJ's decision did not comport with SSR 83-20.  Not only did the ALJ reject McCall's alleged onset date despite the fact that it is not inconsistent with any of the available evidence, but to the extent that an onset date needed to be inferred, the ALJ also failed to engage the services of a medical advisor to assist with such a determination, or to affirmatively develop the record through additional lay testimony.  Additionally, the ALJ provided no rationale, much less a convincing one, for his decision to reject McCall's alleged onset date and arbitrarily replace it with the date of McCall's application for SSI benefits, and this, too, was improper. See Telfair, 2007 WL 1522616, at *8; Martinez, 262 F. Supp. 2d at 4; Felicie, 1998 WL 171460, at *4.  While the ALJ need not have specifically referred to SSR 83-20, he was obligated to apply the analysis that it requires; the failure to do so constitutes reversible error.  See Telfair, 2007 WL 1522616, at *4; Felicie, 1998 WL 171460, at *4; see also Briscoe v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005).

## III. Disposition

Having determined that the ALJ erred in failing to apply POMS RS 01401.030 and SSR 83-20, the only remaining issue is whether the case should be remanded for reconsideration by

the Commissioner on a record to be amplified, or whether it should be remanded solely for

calculation of benefits.  42 U.S.C. § 405(g) provides the exclusive methods by which a district

court may remand a social security case to the Commissioner.  Sentence four of § 405(g)

provides:

> The court shall have the power to enter, upon the pleadings and
> transcript of the record, a judgment affirming, modifying, or
> reversing the decision of the [Commissioner], with or without
> remanding the cause for a rehearing.

42 U.S.C. § 405(g).  Sentence six provides an alternative basis for remand, stating that

> [t]he court may, on motion of the [Commissioner] made for good
> cause shown before [he filed his] answer, remand the case to the
> [Commissioner] for further action by the [Commissioner], and it
> may at any time order additional evidence to be taken before the
> [Commissioner], but only upon a showing that there is new
> evidence which is material and that there is good cause for the
> failure to incorporate such evidence into the record in a prior
> proceeding.

Id.  Because no new material evidence has been adduced, sentence six does not control.  Instead,

pursuant to sentence four, the Court may enter a judgment that affirms, modifies or reverses the

Commissioner's decision "with or without remanding the cause for a rehearing."  Id.

       Generally, where a court concludes that an ALJ has applied an improper legal standard, it

vacates the ALJ's decision and remands the matter to the Commissioner for further proceedings.

See Curry v. Apfel, 209 F.3d 117, 124 (2d Cir. 2000).  "However, where 'the record provides

persuasive proof of disability and a remand for further evidentiary proceedings would serve no

purpose,' the proper remedy is remand solely for calculation of benefits."  Castillo v. Barnhart,

No. 00 Civ. 4343, 2002 WL 31255158, at *14 (S.D.N.Y. Oct. 8, 2002), quoting Parker v. Harris,

626 F.2d 225, 235 (2d Cir. 1980); see also Felicie, 1998 WL 171460, at *6 ("[I]n cases where

courts have ordered reversal and remand solely for calculation of benefits, there has been conclusive or at least non-contradicted evidence in the record demonstrating the claimant's disabled status.").

Similarly, where courts have "had no apparent basis to conclude that a more complete record might support the Commissioner's decision, [they] have [also] opted simply to remand for a calculation of benefits." Butts v. Barnhart, 388 F.3d 377, 385-86 (2d Cir. 2004).  This remedy "is specially warranted where . . . a claimant has already waited a substantial amount of time since first applying for benefits." Castillo, 2002 WL 31255158, at *15.  Indeed, as the Second Circuit recently made clear, "[b]ecause . . . a remand is within the discretion of a district court, the principles calling for some evaluation of relative hardships that govern a discretionary selection of alternative remedies apply, and the hardship to a claimant of further delay should be considered." Butts, 388 F.3d at 387.

Given that "it would be 'considered impossible' that [McCall] suddenly developed a mental condition such as bipolar disorder," Dudelson, 2006 WL 156474, at *6, and that "diagnosis of a claimant's condition may properly be made even several *years* after the actual onset of the impairment," Dousewicz v. Harris, 646 F.2d 771, 774 (2d Cir. 1981) (quotation omitted; emphasis added),[47] the record provides persuasive proof that, having been deemed disabled as of September 29, 1986, on account of severe hypertension, diabetes, obesity, and mental impairments that rendered him unable to maintain adequate social functioning (R. 22, 58, 173, 319, 322, 379), and having lost his job on August 8, 1986, due to excessive absences and

---

[47] See also Kraemer v. Apfel, No. 97 Civ. 8638, 1999 WL 14684, at *4 (S.D.N.Y. Jan. 14, 1999); Agnese v. Chater, 934 F. Supp. 59, 62 (E.D.N.Y. 1996).

47

tardiness that were attributable to these physical and mental impairments, McCall was also suffering from these conditions, and was disabled, some 45-90 days earlier.  Not only has the Commissioner failed to demonstrate any way in which the available evidence is at odds with McCall's alleged onset date of June 30, 1986, but he has also failed to adduce any evidence justifying his own arbitrarily-established onset date of September 29, 1986.  Because SSR 83-20 requires that McCall's alleged onset date be accepted if it is consistent with all *available* evidence, and because such consistency exists here, both law and fact weigh in favor of a June 30, 1986, onset date.

Although courts have sometimes refrained from remanding for a calculation of benefits where, as here, an ALJ has failed to apply SSR 83-20, the Court declines to pursue that route for a number of reasons.  In contrast to those cases in which there is a span of years between a claimant's alleged onset date and the onset date established by the ALJ, and where the services of a medical advisor might therefore be put to good use, the time span involved in this case is a mere 90 days.  Given the proximity of the competing onset dates, the fact that a state ALJ has already found that McCall's medical problems existed and interfered with his work performance on July 28, 1986, at the *latest*, and the presumption against finding that medical impairments – particularly those of a mental nature – have sudden onsets, there is "no apparent basis to conclude that a more complete record might support the Commissioner's decision."  Butts, 388 F.3d at 385-86.

This conclusion is further supported by the apparent absence of any additional medical records with which to supplement the administrative record.  Martinez, 262 F. Supp. 2d at 49 (remanding for calculation of benefits where "[t]he record [was] consistent that plaintiff was

disabled since December 1996" and "there [were] no other medical records available to supplement the administrative record," thus rendering further proceedings unnecessary).  Neither side suggests that medical records are available that are not already part of the record. Moreover, such medical records as may once have been available, and even part of the record before the SSA, were lost and are apparently unrecoverable through no fault of the plaintiff. Finally, there is no basis for believing that additional medical consultation at this time would be of any practical use.  An attempt to specify a particular onset date within a 90-day window by a retrospective medical consultation attempting to assess to severity of symptoms experienced more than 20 years ago could only be speculative.

The relative hardships in this case also weigh in McCall's favor.  McCall has been seeking disability insurance benefits for over two decades, and his third application for such benefits has been pending for more than eight years.  This Court has already remanded the case for consideration of precisely these issues.  The result was a yo-yo process between the Appeals Council and the ALJ that consumed almost a year and a half without producing an adequately-reasoned decision on the very matter on which the remand was ordered.

The SSA has had ample time to develop evidence, including the conclusions of an SSA-appointed medical expert,[48] to undermine McCall's alleged onset date or otherwise bolster its

---

[48] See Arroyo, 973 F. Supp. at 400 (concluding that remand for calculation of benefits was appropriate where the SSA "had ample opportunity to appoint a medical expert" but failed to do so).  Even if the SSA had not had ample time to appoint such an expert, "[r]emand for further proceedings is . . . unnecessary in cases in which the Commissioner has failed to appoint an independent medical expert to assist in the determination of the onset date of the disability, but there are no significant conflicts on the record below for the expert to evaluate."  Manago v. Barnhart, 321 F. Supp. 2d 559, 569 (E.D.N.Y. 2004); see also Martinez, 262 F. Supp. 2d at 49. Because there are no significant conflicts on the record in this case, remand would be inappropriate for this reason as well.

49

own established onset date.  To the extent such evidence may have existed at one time, it has since been lost.  Under such circumstances, the Court is loathe to compel McCall to bear the cost of errors made by the SSA.  See Fowler, 596 F.2d at 604 (noting that the court was "inclined to agree" that where the SSA had lost a claimant's records, it would be unconscionable to permit the SSA to "take a position that in effect permits it to profit by its own error").  Thus, in view of the extreme delay that McCall has already faced in attempting to resolve his application for benefits,[49] the SSA's failure to introduce or otherwise cite any evidence controverting McCall's alleged onset date or justifying its own established onset date, and "the impossibility of determining with complete accuracy the extent of [McCall]'s affliction over two decades ago, the settled policy of construing the statute favorably to the claimant leads [this Court] to the result that seems manifestly just under all the circumstances."  Stark, 497 F.2d at 1101.  Having constructively received wages on December 31, 1980, and having been disabled on or before June 30, 1986, McCall has satisfied the disability insured requirements set forth in Title II of the Act, and his case should therefore be remanded for calculation of benefits.

## CONCLUSION

For the foregoing reasons, the Commissioner's decision is vacated and the case is remanded solely for calculation of benefits.

---

[49] Applicable case law demonstrates that the delay in adjudicating McCall's claim easily satisfies the "substantial amount of time" standard.  See Castillo, 2002 WL 31255158 at *15 (finding a lapse of five and a half years from the date on which plaintiff applied for benefits to be a substantial amount of time); Curry, 209 F.3d at 124 (finding remand for calculation of benefits particularly appropriate where claimant's application had been pending more than six years).

SO ORDERED.

Dated: New York, New York
　　　December 23, 2008

GERARD E. LYNCH
United States District Judge